# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4267 | **DATE** | 3/31/2003 |
| **CASE TITLE** | Mohammed Habeebuddin vs. City of Chicago | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendant's motion for summary judgment (Doc. No. 14-1) is granted and Plaintiff's motion to strike (Doc. No. 24-1) is denied. Judgment is entered in favor of Defendant City of Chicago and against Plaintiff Mohammed Habeebuddin.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | MAR 31 2003 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 3/31/2003 | | |
| | | | date mailed notice | | |
| ETV | courtroom deputy's initials | | ETV | | |
| | | | mailing deputy initials | | |

U.S. DISTRICT COURT
CLERK
03 MAR 31 PM 2:48

Date/time received in central Clerk's Office

MOHAMMED HABEEBUDDIN, )
)
Plaintiff, )
)
v. ) No. 01 C 4267
)
CITY OF CHICAGO, a municipal ) Judge Rebecca R. Pallmeyer
corporation, )
)
Defendant. )

**DOCKETED**
**MAR 3 1 2003**

## MEMORANDUM OPINION AND ORDER

On June 7, 2001, Plaintiff Mohammed Habeebuddin ("Habeebuddin") filed this lawsuit against his employer, the City of Chicago Department of Revenue. Plaintiff alleges, in Count I, that Defendant failed to accommodate his disability, photophobia, in violation of the Americans with Disabilities Act, 29 U.S.C. § 12112 *et seq.* In Count II, Plaintiff invokes Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000, *et seq.*, alleging that Defendant retaliated against him in response to his filing a charge with the Equal Employment Opportunity Commission ("EEOC"). In Count III, Plaintiff claimed that he was discriminated against because of his national origin (he was born in India). Defendant moves for summary judgment on each of Plaintiff's claims.

For the reasons set forth below, Defendant's motion is granted.

## FACTUAL BACKGROUND[1]

Plaintiff Mohammed Habeebuddin is of Indian national origin. (Defendant's Rule 56.1 Statement of Material Facts in Support of Summary Judgment, (hereinafter "Def.'s Rule 56.1"), ¶ 8.) In 1990, Plaintiff began working as a Parking Revenue Security Specialist in the Street Operations Division in Defendant City of Chicago's Department of Revenue. (*Id.* ¶ 9.) Plaintiff

---

[1] The court compiled the facts for this section from the parties' Local Rule 56.1(a)(3) and (b)(3) Statements of Material Facts and attached exhibits. As described below, these statements reflect a number of factual disputes between the parties.

testified that he was the only employee in that Department who is of Indian national origin. (Plaintiff's Deposition, (hereinafter, "Plf.'s Dep."), Ex. F to Plaintiff's Local Rule 56.1 Statement of Facts, (hereinafter, "Plf.'s Rule 56.1"), at 65.) Revenue Security Specialists are responsible for performing security and surveillance activities to insure integrity in the accounting of proceeds from more than 28,000 public parking lots and parking meters within the City of Chicago. (Def.'s Rule 56.1 ¶ 10.) According to the City of Chicago's official job description, the essential duties of a Parking Revenue Security Specialist are:

> Implements security measures to ensure the proper accounting of all parking revenues collected from city-owned parking meters and lots; conducts surveillance of private vendors collecting parking revenues to ensure meter cans are properly removed and replaced; monitors the transport of collection canisters to a designated site for the counting and depositing of monies; carries out established security procedures including the salting of meters, sealing of canisters and tracking of meter keys to reduce potential for theft and vandalism; patrols city streets to locate illegally moved booted vehicles in order to recover boot devices and request towing of vehicles; conducts internal investigations of alleged or suspected misconduct by department employees; prepares work reports of surveillance and investigative activities.[2]

---

[2]    Plaintiff does not deny that these are the essential functions, but instead Plaintiff objects to Stevens' affidavit and the attached official job description. According to Plaintiff, this affidavit contradicts his previous deposition and should be stricken, pursuant to *Maldonado v. U.S. Bank*, 186 F.3d 759 (7th Cir. 1999). In *Maldonado*, however, the Seventh Circuit recognized that it is appropriate for a party to supplement a deposition with an affidavit, so long as the affidavit is not simply an attempt to "patch-up potentially damaging deposition testimony." *Id.* at 769. The Seventh Circuit found that the district court did not abuse its discretion in considering the affidavit in that case where the court first "compared the affidavit to the deposition and determined that any differences did not undermine the affidavit's legitimacy." *Id.* Similarly, in this case, the court has compared the affidavit to the deposition and determined that the affidavit merely supplements the deposition with additional information that was not covered in the deposition. For instance, IN his deposition, Stevens stated that he did not have access to the job description because it was "filed with personnel." (Deposition of Thomas Stevens, Ex. 10 to Def.'s Rule 56.1, at 30.) In his affidavit, Stevens supplemented this answer by providing a copy of the job description and describing the essential duties listed. (Stevens' Aff. ¶¶ 22-24; Official Job Description, Ex. A to Stevens' Affidavit.) Stevens' obtaining access to the job description after giving his deposition is not inconsistent with his testimony that he did not have it at the time of his deposition. Plaintiff has also objected to portions of Stevens' affidavit as immaterial and irrelevant. He offers no explanation for this objection, however, and the court concludes that Stevens' assertions are based on first-hand knowledge and are in fact relevant and material. Thus, Plaintiff's motion to strike Stevens' Affidavit is denied. In addition to his objection to Stevens' affidavit, Plaintiff has objected to a number of
(continued...)

(Affidavit of Thomas Stevens, (hereinafter, "Stevens' Aff."), Ex. 10 to Def.'s Rule 56.1 ¶ 23; Parking Revenue Security Specialist Job Description, (hereinafter, "official job description"), Ex. A to Stevens' Aff.)

At some point in 1993, Plaintiff claims that he reported a co-worker to the City of Chicago for stealing $30,000. (Plf.'s Dep., at 3, 144.) Plaintiff has not identified the co-worker involved, the individual(s) to whom he reported the incident, nor the details regarding the alleged theft, but he claims that after reporting the theft, he was assigned to work at a parking garage for three and a half years as a punishment for making this report. (*Id.* at 144-45.) Later in his deposition, however, Plaintiff testified that from the date he was hired in 1990 until February 8, 1999 he had done nothing but "field work," which was his preferred assignment. (*Id.* at 339, 353.) The parties agree that "field work" includes, among other things, checking on collection crews in the street, replacing parking meter cans, and money counting duties at the bank.[3] (Def. Rule 56.1 ¶ 46.) Neither party has explained whether field work also includes the garage duties described by Plaintiff, nor has either party identified who it was that actually assigned Plaintiff to do field work or garage duties.

Although there were approximately eight Revenue Security Specialists in early 1997, only three remained by June 1997: Thomas Stevens, Stefan Morgan, and Plaintiff. (Def.'s Rule 56.1 ¶ 25.) According to Plaintiff, the numbers dropped because five of the Revenue Security Specialists were fired, (Plf.'s Dep., at 30); Stevens, who became a supervisor the following year, testified that the employees resigned due to a "shake-up in the department," but he did not explain

---

(...continued)
Defendant's 56.1 assertions on the same grounds raised in his motion to strike. The court has denied this motion, and to the extent Plaintiff's objection to portions of Defendant's 56.1 statement is based solely on that motion, the objection is overruled.

[3] Parking meter cans are the objects in parking meters that are used to collect coins deposited in those meters. (Def.'s Rule 56.1 ¶ 44.)

the nature of the "shake-up" or why it resulted in five resignations. (Stevens Dep., at 11.)

Since at least January 1, 1998, Steven Kelso served as the Deputy Director of Street Operations for the Department of Revenue. (Def.'s Rule 56.1 ¶¶ 12, 13.) In this capacity, Kelso oversaw security and parking enforcement, and was responsible for approving disciplinary actions against security personnel. (*Id.*) From November 1999 until at least February 2000, Charles Jones was the Assistant Deputy Director of Street Operations and reported to Kelso. (*Id.* ¶ 14.)

On January 1, 1998, Stevens was promoted from Revenue Security Specialist to Revenue Security Supervisor.[4] (Def.'s Rule 56.1 ¶¶ 18-19.) As a result of this promotion, Stevens supervised all of the Revenue Security Specialists and reported directly to Kelso. (Def.'s Rule 56.1 ¶¶ 18-19.) Around the same time, Stevens also assumed the duties of the Manager of Parking position, which required him to supervise another separate staff. (Stevens Dep., at 26.) Because of the increased workload, Stevens occasionally delegated some of his own responsibilities as Revenue Security Supervisor to Morgan. (*Id.* at 27.) Stevens explained that he selected Morgan rather than Plaintiff because he believed that Morgan knew the operations and because Plaintiff was having difficulties handling his current duties. (Def.'s Rule 56.1 ¶¶ 29, 30.) Plaintiff admitted his shortcomings, explaining that his work performance suffered due to his distress about not having been promoted to the position of supervisor even though he had more seniority and greater experience than Stevens. (Plaintiff's (Corrected) Local Rule 56.1(B)(3)(A) Response to Defendant's Statement of Material Facts, (hereinafter "Plf.'s Rule 56.1 Rsp."), ¶ 30.)

During 1998, Plaintiff had a number of performance infractions, including incorrectly parking his personal vehicle; failure to return a meter key for three days; allowing an unauthorized person into a bank counting room; failure to inspect a parking meter can before it was taken out to the field; and failure to verify that meter keys had been returned to the vault, a facility located on the

---

[4]     There is no indication in the record concerning who it was that promoted Stevens.

4

third floor of the Kraft Building, where keys for City of Chicago parking meters are maintained. (Def.'s Rule 56.1 ¶¶ 65, 147, 151-57.) On January 22, 1999, Plaintiff participated in a regularly scheduled performance evaluation conducted by Stevens.[5]  (Stevens' Aff. ¶ 79.) As part of this evaluation, Plaintiff was rated 2.86 on a performance rating scale from 1 to 5, with 5 being the highest score. (Def.'s Rule 56.1 ¶¶ 157, 158.)  A score of 2 on this scale means the employee "requires improvement"; a score of 3 is "good." (*Id.*) This score of 2.86 was lower than Plaintiff's previous performance rating, but Plaintiff acknowledged in writing on his performance review document that Stevens was "fair" to him, that he was "satisfied" with the rating, and that he would try to improve. (*Id.* ¶¶ 158-160.)

On January 1, 1999, Stevens was promoted to Manager of Off-Street Parking and subsequently, in May 2001, to Manager of Parking. (Def.'s Rule 56.1 ¶¶ 21-22.) The record does not reveal who made these decisions or how they were made. Around this same time, Stevens decided to assign himself and the Revenue Security Specialists to perform vault functions on a rotating basis. (Def.'s Rule 56.1 ¶ 52.) According to Stevens, vault duty was not new to Revenue Security Specialists. (Stevens' Aff. ¶¶ 24-28, 30.)  As early as 1997, according to Stevens, Revenue Security Specialists were tracking meter keys, which are maintained in the vault. (Stevens Aff. ¶¶ 24-28, 30.)  Plaintiff insisted, however, that Revenue Security Specialists were never assigned to the vault before 1999 and that prior to his own assignment to work there, only mechanics were assigned vault duties.[6] (Plf.'s Dep., at 33-34.)

It is undisputed that Plaintiff himself had never been assigned to the vault prior to February 8, 1999, when Stevens met with Plaintiff and assigned him to the vault. (Plf.'s Rule 56.1 ¶¶ 6, 8.)

---

[5]      Although neither party provides the exact schedule for each employee's performance evaluation, there is some evidence in the record that these evaluations are held every six months.  (Stevens' Aff. ¶¶ 68, 79.)

[6]      Neither side has explained the duties of a mechanic or how that position relates to the one held by Plaintiff.

Both sides agree that vault duties include: opening the vault, distributing and tracking the keys stored in the vault, and completing the necessary paper work to assist with the tracking of keys. (Def.'s Rule 56.1 ¶¶ 39-44.) Plaintiff claims that his assignment to vault duty was a form of punishment for his honesty in reporting the theft in 1993.[7] (Id. ¶ 266.) It is undisputed, however, that Plaintiff did not object to working at the vault during a meeting on or about January 22, 1999, when Stevens first discussed the vault assignment with Plaintiff. (Def.'s Rule 56.1 ¶ 49.) Stevens asserts that Plaintiff's assignment to the vault was on a rotating basis (Stevens Aff. ¶ 37), but Plaintiff claimed that he was assigned to the vault for two months without a break before someone began rotating with him. (Plf.'s Dep., at 30.) Neither party has explained the typical rotation period or schedule for vault rotations.

Soon after Plaintiff starting working in the vault, he started complaining about the assignment to his supervisors. (Def.'s Rule 56.1 ¶¶ 74-76.) In February 1999, Plaintiff complained to Jones that he should not be assigned to vault work. (Id. ¶ 74.) In February or March 1999, Plaintiff complained to Stevens about the loud music that Shirley Davis, a maintenance mechanic, played in the vault. (Id. ¶ 75.) The record does not disclose how this issue was resolved. In April 1999, Plaintiff complained to Stevens that his seniority should excuse him from working at the vault. (Id. ¶ 76.) Both sides agree, however, that work assignments for Revenue Security Specialists are not based on seniority. (Id. ¶ 77.)

Plaintiff's most significant complaint for the purposes of this litigation pertained to the lighting in the vault. Both sides agree that the vault was illuminated by a bare tube flourescent fixture that hung from the ceiling. (Plf.'s Rule 56.1 ¶ 7.) During his first week working there, Plaintiff complained to Stevens that the vault lighting was giving him headaches and eye problems

---

[7]     Defendant has not disputed Plaintiff's assertion that he reported a theft in 1993. Plaintiff has not explained why his reporting a theft would have motivated anyone to take action against him, nor has he offered any evidence that would support a link between the report in 1993 and the vault assignment six years later.

and was interfering with his sleep. (*Id.* ¶ 11.) When Plaintiff asked Stevens how long he would be assigned to the vault, Stevens responded that Plaintiff would be working there until further notice, and suggested that Plaintiff wear sunglasses. (Plf.'s Rule 56.1 ¶ 11.) Defendant points out that Plaintiff did not have headaches when he was assigned to the bank, where he worked under flourescent lights for 18 months, prior to his assignment to the vault.[8] (Def.'s Rule 56.1 ¶¶ 59, 80.) Plaintiff explained that the bank's lighting was still uncomfortable, but it was better than the vault lighting because it was not as bright. (Plf.'s Dep., at 137-39.)

**Plaintiff's Alleged Disability**

On April 8, 1999, Plaintiff first consulted a doctor, his optometrist, about the eye problems he experienced from the vault lighting. (*Id.* ¶¶ 82-83.) Plaintiff's optometrist, Dr. Barry Siegel, observed that Plaintiff had photophobia, a sensitivity to bright lights, but he could not determine what was causing it, because "everything appeared normal" in Plaintiff's eyes. (*Id.* ¶ 86.) Both sides agree that photophobia is a symptom rather than a condition or diagnosis. (*Id.* ¶ 85.) Dr. Siegel provided Plaintiff with a note stating that Plaintiff had photophobia and that the light in the vault was bothering his eyes.[9] (*Id.* ¶ 84.) At some point later in April, Plaintiff submitted Dr. Siegel's April 8, 1999 note to Stevens (*Id.* ¶ 117), who forwarded it to Kelso, Jones, and Maribeth Anderson, Director of Personnel for the Department of Revenue. (Plf.'s Rule 56.1 ¶ 15; Def.'s Rule 56.1 ¶ 15.) Siegel recommended that Plaintiff wear sunglasses to protect his eyes and that he work in an environment with "subdued" light to eliminate the eye strain and headaches he experienced. (*Id.* ¶¶ 84, 118.) Plaintiff began wearing sunglasses in late March 1999, which, according to Plaintiff, helped his eye condition "at least a bit." (*Id.* ¶¶ 112-113.) Because Siegel is not an expert in the area of photophobia was unable to determine the cause of Plaintiff's

---

[8]     Presumably this bank duty was part of Plaintiff's field work that he performed prior to his assignment to the vault.

[9]     The record does not indicate to whom this note was addressed.

photophobia, he recommended that Plaintiff consult an ophthalmologist. (*Id.* ¶ 86.)

Siegel conducted two follow-up exams of the Plaintiff. During an exam on May 10, 1999, Siegel noted that bright lights might be causing Plaintiff's headaches, eyestrain and fatigue. (*Id.* ¶ 119.) After this follow-up exam, on May 27, 1999, Siegel wrote a second note, stating that Habeebuddin "suffers from fatigue, glare and possible headaches secondary to the bare flourescent bulbs in the office. It would be appreciated if you could change [Plaintiff's] work environment to help minimize the problem." (*Id.* ¶ 120.)

Although Defendant acknowledges receiving Siegel's first note, whether subsequent notes from Plaintiff's doctors were provided to Plaintiff's managers is less certain. Plaintiff only stated generally that he submitted all of his doctors' notes to Stevens, but failed to identify the specific notes or the dates on which he submitted them. (Plf.'s Dep., at 142.) Furthermore, Anderson stated in her deposition that she could not remember which note or notes she received, and Stevens only stated generally that he received more than one doctor's note from Plaintiff, but could not remember any specific notes other than the April 8, 1999 note from Dr. Siegel. (Deposition of Maribeth A. Anderson, (hereinafter "Anderson Dep."), Ex. C to Pltf.'s Rule 56.1, 66-67; Stevens Dep., at 76.) It is undisputed, however, that when Stevens received a doctor's note from Plaintiff, he notified Jones and Anderson. (Plf.'s 56.1 ¶ 15.)

On May 27, 1999, Plaintiff followed Siegel's advice and consulted an ophthalmologist, Dr. David Tresley. (Def.'s Rule 56.1 ¶ 87.) Dr. Tresley could not identify any organic cause for the photophobia and assured Plaintiff that there was nothing medically wrong with his eyes. (*Id.* ¶¶ 88-89.) Like Siegel, Tresley characterized photophobia as a symptom rather than a condition or diagnosis. (Deposition of David J. Tresley, (hereinafter, "Tresley Dep."), at 30, Ex. 8 to Def.'s Rule 56.1).) According to Tresley, prolonged exposure to bright lights would not cause any long-term

effects, and Plaintiff was able to continue working.[10] (Def.'s Rule 56.1 ¶ 95.) Specifically, Tresley stated that a bare overhead hanging flourescent light had no specific damaging effects on the eyes. (*Id.* ¶ 108.) Tresley prescribed glasses for Plaintiff, which he believed would improve Plaintiff's symptoms. (*Id.* ¶ 101.) In addition, Tresley wrote a note addressed to Defendant, on Plaintiff's behalf, stating "it would be appreciated if you could change" Plaintiff's work environment because the bare flourescent bulb causes Plaintiff discomfort. (Tresley Dep., at 25-27.) The record does not indicate whether Plaintiff gave this note to any of his supervisors.

Tresley opined that Plaintiff was not doing everything he could to alleviate his symptoms because Plaintiff did not fill the prescription for new glasses as of February 2000. (Def.'s Rule 56.1 ¶¶ 103-04; Tresley Dep., at 63-64.) Plaintiff explained at his deposition that he was "ninety percent" certain that the reason he didn't fill the prescription was because of financial difficulties he had at the time, but he also admitted that he never actually explored the cost of filling this new prescription. (Plf.'s Dep., at 111-112.)

On June 5, 1999, Plaintiff visited his internist, Dr. Bowser. (Def.'s Rule 56.1 ¶ 105.) Bowser, like the other doctors Plaintiff consulted, determined Plaintiff had photophobia. (*Id.* ¶ 107.) Bowser drafted a note on Plaintiff's behalf requesting that Defendant alter Plaintiff's work environment because bright lights could be aggravating his photophobia. (Plf.'s Rule 56.1 ¶ 20.) Although he drafted this note, Bowser also believed that Plaintiff's discomfort could be caused by his failure to fill his prescription for new glasses. (Def.'s Rule 56.1 ¶¶ 106, 107; Deposition of Robert Bowser, Ex 3 to Def.'s Rule 56.1, at 22-23.) Again the court notes that the record is unclear as to who, if anyone, received this note.

Plaintiff claims that the bright lights in the vault had caused permanent damage to his eyes

---

[10]     Although Plaintiff did not dispute this assertion in responding to Defendant's 56.1 Statement, he did dispute it in his deposition, testifying there that he believed his condition was long term and that he will continue to have headaches and eye problems "for life." (Plf.'s Dep., at 39-40.)

(Plf.'s Dep., at 40); however, no medical evidence has been provided to the court to substantiate this claim. To the contrary, Plaintiff acknowledged in his deposition that the doctors informed him that his vision problems would not persist for life. (*Id.*) Plaintiff claims, however, that his photophobia affects his ability to read, watch TV, and enjoy the outdoors. (Plf.'s Dep., at 25-26, 48-50.)

**Defendant's Response to Plaintiff's Eye Problems**

Plaintiff's supervisors responded in a variety of ways to Plaintiff's complaints about his eye problems. In April 1999, Stevens changed Plaintiff's schedule to one week in the vault and one week on the street. (Plf.'s Rule 56.1 ¶ 17.) Beginning in late April or early May 1999, when changing the lighting inside the vault failed to satisfy Plaintiff, Stevens allowed Plaintiff to perform his vault duties at a desk located just outside of the vault. (Def.'s Rule 56.1 ¶ 125.) This new arrangement alleviated Plaintiff's eye problems and he found that the lighting outside the vault was better than the light in the vault. (*Id.* ¶ 127-29; Plf.'s Dep., at 138.) Nevertheless, on May 24, 1999, Plaintiff submitted a four page document entitled "Request for Reasonable Accommodation" requesting that he be assigned field work instead of vault work due to his photophobia and presbyopia. (Plf.'s Rule 56.1 ¶¶ 21, 23, 25.)[11] Although the record is unclear regarding which of Plaintiff's supervisors first received this document, both Stevens and Anderson remember seeing and reading this document around the time it was submitted. (Stevens Dep., at 77-78; Plf.'s Rule 56.1 ¶¶ 21, 23, 25.)

At some point after receiving Plaintiff's May 24, 1999 request, Anderson personally visited the Kraft Building, and discussed the lighting issue with a mechanic assigned to the vault.[12] (*Id.*

---

[11]     Presbyopia is defined as "aging eyes," a "normal occurrence with aging." (Def.'s Rule 56.1 ¶ 96; Tresley Dep., at 22-23.)

[12]     The parties do not provide the full name of this mechanic, nor do they explain what Anderson learned from him regarding the vault lighting.

¶ 30.) Anderson also discussed the lighting issue with the Kraft Building superintendent (whose name Anderson could not recall), who recommended changing the light bulb in the vault and installing a shield; both changes were soon made by Defendant. (*Id.* ¶ 31.) After these changes were made, however, Plaintiff complained that the new bulb was worse than the original bulb, and some time later the original bulb was replaced. (*Id.*)

Stevens attempted to go a step further; at some point during Plaintiff's tenure in the vault, Stevens requested that the General Services unit within the City replace the light fixture. (Plf.'s Rule 56.1 ¶ 48.) General Services declined Stevens' request, however, because the Kraft Building was scheduled for demolition. (*Id.*)

By November 1999, Plaintiff no longer worked at the vault (*id.* ¶ 134) and was reassigned to "field work." (Plf.'s Dep., at 35, 149-50.) Although Plaintiff claims that he continued to experience eye discomfort and headaches even after being assigned to field work, he acknowledged that his situation improved with this new assignment. (*Id.* at 149.)

**Plaintiff's Work Performance Problems**

Plaintiff's tenure between February and November 1999 was marked by a number of performance problems. On February 9, 1999, Plaintiff made two key counting mistakes; the next day, he made two more. (Def.'s Rule 56.1 ¶¶ 160-61.) On February 10, 1999, Stevens discovered that Plaintiff had not started to inventory the key cabinets, a task that he had originally assigned Plaintiff on February 8, 1999 and had reminded Plaintiff about earlier on February 10, 1999. (*Id.* ¶¶ 162-65.) Also on February 10, 1999, Plaintiff left his assigned work area without authorization from 1:30 p.m. to 2:30 p.m. and again from 2:45 p.m. to 4:10 p.m. (*Id.* ¶ 166.)

As a result of Plaintiff's performance problems, a pre-disciplinary hearing was held on February 16, 1999. In attendance were Plaintiff, Stevens, Jones, Anderson, and Morgan, Plaintiff's co-worker to whom Stevens delegated some supervisory functions. (*Id.* ¶ 168.) During the

hearing, Plaintiff did not dispute any of the charges of misconduct and indicated that he would try to improve. (*Id.*) He asserts now, however, that his ability to perform his job properly was impaired by the headaches and blurred vision he suffered as a result of working in the vault. (Plf.'s Dep., at 53-54.) Following the hearing, Stevens, Anderson, and Jones met and decided formal discipline was warranted. (*Id.* at 169.) On February 18, 1999, a written reprimand was issued to Plaintiff, stating that Plaintiff's mistakes counting keys presented a serious security breach. (Def.'s Rule 56.1 ¶¶ 167-70.) Although Stevens had been in support of issuing Plaintiff formal discipline, on February 19, 1999 Stevens asked Jones to hold Plaintiff's written reprimand "in abeyance" unless Plaintiff had another performance problem in the next six months.[13] (*Id.* ¶ 171; Stevens' Aff. ¶ 90.) Stevens made this request because he noticed Plaintiff's performance had improved over the three days following the hearing. (Def.'s Rule 56.1 ¶ 171; Stevens' Aff. ¶ 90.)

Plaintiff's improved performance was short-lived, however. On March 3, 1999, Plaintiff issued two sets of incorrect keys to parking employees, and he failed to keep a record of another set of keys that he issued. (*Id.* ¶ 173.) On March 4, 1999, Plaintiff issued damaged keys to parking employees, even though Stevens had asked him to look out for damaged keys only the day before. (*Id.* ¶¶ 174-75.) On March 4 and March 8, 1999, Plaintiff issued incorrect keys to parking employees. (*Id.* ¶¶ 176-179.) On March 9, 1999, Plaintiff failed to properly document keys that he had distributed. (*Id.* ¶ 180.) On March 10, 1999, Plaintiff miscounted keys and failed to document key distributions. (*Id.* ¶ 181.) On March 11, 1999, he miscounted three sets of keys. (*Id.* ¶ 182.) When Plaintiff again issued incorrect keys on March 16, 1999, Stevens talked with Plaintiff and asked him to be more careful. (*Id.* ¶ 183-84.) Nevertheless, on March 29, April 6 and April 12, 1999, Plaintiff issued incorrect keys to parking employees. (*Id.* ¶¶ 185-88.)

On April 7, 1999, Stevens announced that Morgan was in charge of the "Street" and

---

[13]     The record is unclear what impact holding the reprimand in abeyance would have on Plaintiff's employment status or whether ones acted on Stevens' suggestion.

directed Morgan to retrain Plaintiff to address his ongoing performance problems. (Def.'s Rule 56.1 ¶¶ 31, 190.) Although Stevens announced Morgan's new role in April, there is some evidence in the record that Morgan was awarded this unofficial title and responsibility several months earlier, when Stevens was promoted to Off-Street Parking Enforcement Manager, on January 1, 1999. (Plf.'s Rule 56.1 Rsp. ¶ 31; Stevens Dep., at 25-26.) Morgan began the retraining process on April 12, 1999 (*id.* ¶¶ 192-210), but despite the retraining, Plaintiff continued to experience difficulty properly performing his job. On April 13, 1999, Plaintiff replaced 10 parking meter cans, but failed to log them until April 19, a violation of Revenue Security policy requiring that meter cans be logged in on the same day that they are replaced. (Def.'s Rule 56.1 ¶¶ 211, 214-16.) On April 20, 1999, Plaintiff had "pulled" the keys for only two areas, a project that should have taken only 30 minutes, despite the fact that he had been at work for two hours. (*Id.* ¶ 213; Stevens Aff. ¶ 122.) Later that same morning, at 9:50 a.m, Plaintiff walked into Stevens' office, stated he was on break, and began eating an apple. (Def.'s Rule 56.1 ¶ 213.) At 10:50 a.m. the same day, Stevens saw Plaintiff in the cafeteria.[14] (*Id.*) On April 21, 1999, Plaintiff issued a set of keys that included a broken key, rendering it useless to the parking employee. (*Id.* ¶ 214.) Also on April 21, Plaintiff failed to do any of the key inventory assigned by Stevens. (*Id.* ¶ 215.) Later that same day, Plaintiff failed to report a missing fault key. (*Id.* ¶ 216.)

On April 27, 1999, a second pre-disciplinary hearing was held, this one attended by Plaintiff, Stevens, Jones, and Anderson. (*Id.* ¶ 218.) At the meeting, Plaintiff's supervisors discussed his performance problems and imposed a one-day suspension to be served on May 5, 1999. (*Id.* ¶¶ 218, 220, 222.) Jones, Stevens, and Anderson all agreed that the suspension was appropriate, and the decision was later approved by Kelso. (*Id.* ¶¶ 220, 221.) At the hearing, Plaintiff again stated that he would try harder to meet performance standards. (*Id.* ¶ 218.) After the one-day

---

[14] The parties do not explain what Plaintiff was doing in the cafeteria, nor does Defendant explain whether this was some type of policy infraction.

suspension, Plaintiff continued to experience difficulty performing his job, including misreporting information about vault keys and failing to replace cans. (*Id.* ¶¶ 223-26.) These mistakes, according to Plaintiff, resulted from the eye problems he experienced from the vault lights. (Plf.'s Dep, at 53-54.)

Around April or May 1999, Plaintiff overheard Morgan say something about not wanting any other lawsuits against the City of Chicago. (*Id.* ¶ 265.) Plaintiff did not, however, overhear the context of the conversation and does not remember who Morgan was speaking with at the time. (*Id.*)

On May 27, 1999, Plaintiff filed a discrimination charge with the EEOC, alleging disability discrimination and national origin discrimination. (*Id.* ¶ 248.) Specifically, Plaintiff alleged in the charge that Defendant discriminated against him because of his national origin and his disability by assigning him to the vault in February 1999, and by denying him a promotion to Acting Revenue Security Supervisor on April 8, 1999. (Ex. A to Complaint.)

In June or July, Plaintiff had another performance evaluation. For the period of time between January 1, 1999 and June 30, 1999, Stevens gave Plaintiff a performance rating of 2.2. (*Id.* ¶ 227.) After receiving the rating, Plaintiff agreed to a performance improvement plan. (*Id.* ¶ 228.) The record does not offer specific information regarding the implementation of this plan, but Plaintiff continued to make mistakes at work. (*Id.* ¶¶ 229-32.) Specifically, on September 14, 1999, September 15, 1999, and November 16, 1999, Plaintiff failed to collect coins from parking meters, failed to examine keys shipped to the vault by a key manufacturer, and failed to account for time worked. (*Id.*)

In September 1999, the Department of Revenue sought to fill the position of Revenue Security Supervisor; Morgan was already performing this work in an acting capacity. (*Id.* ¶ 277.) Stevens, in his capacity as Manager of Off-Street Parking, interviewed and scored seven candidates for the position of Revenue Security Supervisor, including Morgan and the Plaintiff. (*Id.*

¶¶ 279-80.) Plaintiff received a score of 3.13 on a five point scale, second lowest of the seven candidates, while Morgan and two other candidates received the high score of 4.13.[15] (*Id.* ¶¶ 279, 281, 283-84.) In the comments section of Plaintiff's evaluation form, Stevens noted that Plaintiff has had problems following directions in the past, and that he thought Plaintiff "would have problems with the added responsibility this position demands." (Plf.'s Rule 56.1 ¶ 79.) Regarding Morgan, Stevens observed that he "has been doing very well in his position. I think he would be very good for this position." (*Id.* ¶ 80.) The parties did not provide scores or comments for the remaining candidates. There is no evidence that Plaintiff challenged the scoring in any way.

Kelso reviewed the paperwork for the top three scoring candidates and determined that Morgan should be promoted; Morgan's promotion was effective September 16, 1999. (Def. Rule 56.1 ¶¶ 33, 285-287.) After this promotion, all of the Revenue Security Specialists, including Plaintiff, reported directly to Morgan, who reported to Stevens. (*Id.* ¶¶ 34-35.) Plaintiff agrees that no one involved in the decision to promote Morgan made any statements pertaining to any candidate's national origin or health issues. (Plf.'s Rule 56.1 Rsp. ¶¶ 287-88.)

Morgan stated that he suspended Plaintiff for three days soon after he was promoted to supervisor (Deposition of Stefan Morgan, Ex. E to Pltf.'s Rule 56.1 at 63), but there is no other evidence of such a suspension in the record, and Plaintiff himself made no mention of it in his deposition. It is undisputed, however, that Morgan was a stricter supervisor than Stevens. (Plf.'s Rule 56.1 ¶ 51.) It is also undisputed that Morgan issued his own "Standard Operating Procedures," which were not approved by his supervisors, to Security Specialists. (*Id.* ¶ 66.) The new procedures were a list of assignments that Morgan expected each Parking Security Specialist

---

[15] The scoring system ranks each candidate on a scale from 1 to 5 on four different criteria: previous experience, supervisory experience, previous performance, written communications, and oral communications. (Hiring Criteria Rating Form, Ex. D-F to Stevens Aff.) The criteria are weighted and the scores then averaged; a score of 3 means the candidate meets requirements and 4 means he slightly surpasses requirements. (Def. Rule 56.1 ¶¶ 279-83.)

to complete each day. (Standard Operating Procedures, Ex. 17 to Anderson Dep., at 1.) Specifically, the procedures describe how a Security Specialist is expected to deal with paperwork, City equipment, and other employees.

On November 26, 1999, Plaintiff submitted a note drafted to "whom it may concern," in which he complained of mistreatment by his supervisors: Kelso, Stevens, and Morgan. (Plf.'s Rule 56.1. ¶ 71; November 26, 1999 Letter from Plaintiff, Ex. 9 to Plf.'s Dep.) Although it is unclear who received this note, the note stated that on June 4, 1999, Plaintiff met with Kelso and Stevens to discuss his problems with the vault lighting and that during this conversation, Kelso used language that Plaintiff found offensive. (*Id.*) Specifically, Plaintiff recalled, during this meeting, Kelso asked "what the fuck is going on" and "can you stop all those fucking phone calls for your promotion."[16] (Plf.'s Rule 56.1 ¶ 148; November 26, 1999 Letter from Plaintiff, Ex. 9 to Plf.'s Dep.) Plaintiff also complained in the letter that Stevens and Morgan were supervising him too closely. (Def.'s Rule 56.1 ¶ 148; November 26, 1999 Letter from Plaintiff, Ex. 9 to Plf.'s Dep.)

On December 6, 1999, the City received a complaint that someone had requested Plaintiff's assistance and that it took him a "long time" before he got there.[17] (Def.'s Rule 56.1 ¶ 233.) When Morgan questioned him about the incident, Plaintiff stated that he was having trouble finding the location. (*Id.*) As a result, some time after the incident, Morgan issued a street map to Plaintiff and rode with him in an attempt to help him. (*Id.*) Plaintiff testified in his deposition that, during the ride, Morgan bothered him by instructing him to make turns using an "insulting attitude." (*Id.* ¶ 235.) On December 6, 1999, Plaintiff submitted another note that complained about Morgan's "insulting attitude and rough tone." (Plf.'s Rule 56.1 ¶ 72.) Once again, the record does not indicate to whom this note was submitted.

---

[16]     The record is unclear regarding what promotion Plaintiff's was pursuing with Kelso.

[17]     The parties do not describe exactly how long it took Plaintiff to arrive at the site or who requested Plaintiff's assistance.

On January 11, 2000, Morgan left a written list of tasks for Plaintiff and one other Revenue Security Specialist to perform. (*Id.* ¶ 242.) Plaintiff, as the more senior worker, was expected to make sure that the work was completed. (*Id.*) Plaintiff did not complete all of the work Morgan assigned. (*Id.*) In explaining why certain assignments were not completed, Plaintiff claimed that he did not receive his assignments from Morgan that day; Stevens found this "implausible." (*Id.* ¶ 243.) In Stevens' view, if Plaintiff could not find his assignments, he should have contacted Morgan. (*Id.*)

On January 13, 2000, Stevens lost radio contact with a meter collector. (*Id.* ¶ 244.) He instructed Plaintiff to find the meter collector and gave Plaintiff the meter collector's last known location. (*Id.*) Plaintiff went to the last known location and stayed there for two hours without ever finding the meter collector or leaving the location in an effort to expand the search. (*Id.*) In explaining his actions to Stevens, Plaintiff claimed that Morgan had told him to remain at that location, an assertion Morgan denied. (*Id.* ¶ 245.) At approximately the same time, Morgan scared Plaintiff by discussing his past military experiences. (Def.'s Rule 56.1 ¶ 274.) According to Plaintiff, Morgan stated that he had killed people and that he knew how people die. (Plf.'s Dep., at 229.) Although Morgan admits discussing his military experience, he denies telling Plaintiff he killed people. (Deposition of Stefan Morgan, at 94.)

In January 2000, Morgan resigned his position with the Department of Revenue, after receiving a 30-day suspension. (Plf.'s Rule 56.1 ¶ 68.) The record is silent as to the reasons for the 30 day suspension, or who imposed it. (*Id.* ¶ 68.) Jesus Elizondo took up the position of Revenue Security Supervisor effective January 1, 2000. (Def.'s Rule 56.11 ¶ 291, 300.) Prior to the position change, Elizondo had been supervising the Booter-Parking area.[18] (*Id.* ¶¶ 298, 300.) Iris Fisher, Personnel Analyst III, had conducted an audit of that position and had concluded that

---

[18]     In this capacity, Elizondo was responsible for the booting and towing of illegally parked cars. (Iris Fisher Affidavit, Ex. 9 to Plf.'s Rule 56.1 ¶ 11.)

Elizondo should be reclassified as a Revenue Security Supervisor. (*Id.* ¶¶ 294, 297.) This audit process resulting in a reclassification of Elizondo's position did not constitute filling a new position and was therefore not subject to posting or bidding by other employees. (*Id.* ¶ 296.) Elizondo's reclassification was approved by the Director of the Personnel Department, Glenn E. Carr, and resulted in Elizondo's job title change. (*Id.* ¶ 299.) Plaintiff admitted that no one said anything to suggest that Elizondo became Revenue Security Supervisor because he was non-Indian or because of any health related issues.[19] (*Id.* ¶¶ 301-02.) On January 3, 2000, Plaintiff submitted a note complaining that Elizondo's promotion to supervisor was the third time he had been passed over for that position. (Plf.'s Rule 56.1 ¶ 73.) In this note, Plaintiff claims that he was passed over because of his nation of origin. (Plaintiff's January 3, 2000 Note, Ex. 15 to Morgan Dep.) The record does not indicate to whom this note was given.

On January 18, 2000, a third pre-disciplinary hearing was held regarding Plaintiff's performance. (Def.'s Rule 56.1 ¶ 246.) At this hearing, Jones, Stevens, and Plaintiff discussed the events of January 11 and 13, 2000, along with the Plaintiff's other performance infractions. (*Id.* ¶ 246.) In responding to the charges of poor performance, Plaintiff stated that he would be willing to attend any re-training Defendant deemed necessary to improve his performance. (*Id.*) Jones, Kelso, Anderson, Stevens, and Morgan concurred in imposing a three-day suspension on Plaintiff, which was served from January 25 through 27, 2000. (*Id.* ¶¶ 247-48.)

On January 24, 2000, Plaintiff submitted another note, stating that he was displeased with the three-day suspension and that he believed he was being retaliated against for filing "his first EEOC charge." (*Id.* ¶ 74.) In this note, Plaintiff claimed that his supervisors' bad treatment was making him "mentally sick." (January 24, 2000 Letter from Plaintiff, Ex. 16 to Deposition of Stefan Morgan.) Although he complained about his supervisors in general, Plaintiff also mentioned

---

[19]     The Plaintiff in his deposition refers to a Jesse Domingues rather than Jesse Elizondo; the court assumes that Domingues is the same person as Elizondo.

Morgan by name in his note. (*Id.*) Specifically, Plaintiff stated that Morgan was giving him a "hard time" every day and that Morgan was the person responsible for his three-day suspension. (*Id.*) The record does not identify the person or persons within the Department of Revenue to whom Plaintiff submitted this note.

On January 25, 2000, Plaintiff filed a second discrimination charge with the EEOC, claiming that he was discriminated against based on his national origin and his disability. In addition, Plaintiff alleged that his supervisors retaliated against him for filing his first EEOC complaint by harassing him, issuing write-ups, and imposing a three-day suspension. (Def.'s Rule 56.1 ¶¶ 250-51.) On January 27, 2000 (the final day of his three-day suspension), Plaintiff requested and was granted a leave of absence at half pay. (Plf.'s Dep., at 82-83, 217-220.) Plaintiff cited continuing problems with his eyes, headaches, and inability to concentrate as the reasons for his leave. (*Id.* at 217-220.)

On or about April 14, 2000, Plaintiff amended his second charge of discrimination to include a claim of retaliation. (*Id.* ¶ 252.) On March 22, 2001, the EEOC issued a right-to-sue notice. (Ex. C to Complaint.) This action followed.

## DISCUSSION

As stated briefly earlier, Habeebuddin claims that he was discriminated against by Defendant under the ADA and Title VII. Specifically, Plaintiff alleges that Defendant failed to accommodate his disability, photophobia, in violation of the ADA. Plaintiff also alleges that Defendant harassed him in retaliation for filing an EEOC charge in violation of Title VII.[20] As originally drafted, Plaintiff's complaint also included a count alleging national origin discrimination.

---

[20] The court notes that this claim as originally presented in the Plaintiff's complaint alleged that Defendant retaliated by performing certain specific adverse acts against Plaintiff. In his brief in opposition to the motion for summary judgment, Plaintiff has altered this claim slightly, asserting that Defendant retaliated against him by creating a hostile work environment. (Plaintiff's Memorandum In Opposition to Defendant's Motion for Summary Judgment, (hereinafter, "Plf.'s Brief"), at 13.)

The court will not consider that claim, however, because Plaintiff has abandoned that claim in his memorandum in opposition to summary judgment.[21] Defendant now moves for summary judgment on all of Plaintiff's claims.

A motion for summary judgment will be granted only if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The court must consider the evidence and draw all reasonable inferences in favor of the nonmoving party. *Gennington v. Caterpillar, Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). When factual matters are in dispute, the court is "obligated to credit [plaintiff's] version of events over the defendants." *Hostetler v. Quality Dining*, 218 F.3d 798, 802 (7th Cir.2000). Employment cases are fact-intensive, but that does not mean that the court is required to "scour the record" for factual disputes in an effort to assist the plaintiff avoid summary judgment. *Greer v. Bd. of Ed. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001). The court addresses Defendant's motion with these standards in mind.

**Americans with Disabilities Act Claim**

Habeebuddin alleged in both his EEOC charge and in his complaint filed in this court that Defendant, City of Chicago Department of Revenue, discriminated against him under the Americans with Disabilities Act (ADA) by not accommodating his disabling light sensitivity, photophobia. Discrimination under the ADA can take two forms: (1) disparate treatment, a claim that a qualified individual with a disability was treated differently than a non-disabled employee due to his disability; and (2) failure to accommodate, a claim that the employer did not make reasonable accommodations for a disabled but otherwise qualified individual. *See, e.g., Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).

---

[21] Plaintiff acknowledged that there is insufficient evidence to prove this claim. (Plf.'s Brief, at 1 n.1.)

Regardless of the form of ADA discrimination alleged, however, Plaintiff has the burden to establish that he was "a qualified individual with a disability" under the ADA. 42 U.S.C. § 12112(a); *Contreras v. Suncase Corp.*, 237 F.3d 756, 762 (7th Cir. 2001). Defendant asserts in this case that Habeebuddin is unable to meet this initial burden. The court agrees.

The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 121202(2). Habeebuddin has pursued his claim under the first prong, alleging that photophobia is a physical impairment that substantially limits one or more major life activities. Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Both sides agree that Plaintiff's photophobia affects the major life activity of seeing. Defendant maintains, however, that Plaintiff is not disabled under the ADA because photophobia is not an "impairment" for the purposes of the ADA and because Plaintiff's photophobia does not "substantially limit" his ability to see.

Defendant argues, first, that photophobia is not an "impairment" under the ADA. An impairment for purposes of the ADA is defined as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine" 29 C.F.R. § 1630.2(h). Because photophobia is neither a condition or a disease, Defendant argues that it can not serve as an impairment for purposes of the ADA. The court notes that both sides agree that photophobia is a symptom, similar to pain or fatigue. (Plf's Brief, at 3.)[22] In addition, Dr. Tresley, Plaintiff's treating ophthalmologist, himself told Plaintiff that there was nothing

---

[22]    The court notes that Plaintiff has not numbered every page in his brief, but this information is in fact contained on the third page of his brief.

medically wrong with his eyes. (Def.'s Rule 56.1 ¶ 89.)

Plaintiff argues in response that the court should adopt a different definition for impairment than the one suggested by Defendant. Specifically, Plaintiff claims that the definition of disability used to determine a person's eligibility for Social Security benefits is instructive regarding the meaning of impairment. For the purposes of awarding Social Security Disability benefits, a person is disabled if he or she has an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. 404.1505(a). Because photophobia is "medically determinable", Plaintiff argues, it qualifies as an impairment. The court is reluctant to ignore the ADA definition of "impairment" or "disability," in favor of the terms as defined by the Social Security Administration. *Cf. Weiler v. Household Finance Corp.*, 101 F.3d 519, 523-24 (7th Cir. 1996) (ADA definitions are unique and the legal standards regarding a disability vary for purposes of the ADA and the Social Security Disability determination.) The court need not decide whether a symptom without an organic cause can constitute an impairment, however, because it finds that the issue of whether Plaintiff is "substantially limited" in the major life activity of seeing dispositive on this issue.

According to EEOC interpretive guidelines, "substantially limits" means "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j). Plaintiff argues that photophobia substantially limited his ability to see because it has resulted in his diminished vision that has negative effects both at work and in his daily life. Specifically, Plaintiff claims that as a result of photophobia he is limited in his ability to watch television and read and he must always wear sunglasses while outside. Plaintiff also acknowledges, however, that photophobia is episodic, meaning it only flares up when Plaintiff is around bright lighting. (Plaintiff's

Brief, at 6.)

The limitations Plaintiff described are not supported by medical evidence. Dr. Tresley, the ophthalmologist who treated Plaintiff, stated that Plaintiff was not limited in any manner or activity based on photophobia. Dr. Tresley observed simply that, like many people, Plaintiff is annoyed by bright lights. Plaintiff's internist, Dr. Bowser, stated that photophobia does not cause any damage. Significantly, none of the doctors Plaintiff consulted recommended that he limit his activities in any way. At most, the doctors recommended that Plaintiff wear sunglasses.

The court is not inclined to find that Plaintiff's diminished ability to see when around bright lights is sufficient to constitute a substantial limitation on the major life activity of seeing. In fact, ample authority defeats his claim. In a case involving a plaintiff with an limitation similar to Habeebuddin's, *Szmaj v. American Tel. & Tel. Co.*, 291 F.3d 955, 956 (7th Cir. 2002), plaintiff had a condition known as congenital nystagmus, which made it difficult for plaintiff to focus his eyes, resulting in discomfort when he reads. The plaintiff's condition prevented him from performing a job that required him to read for more than 50 percent of the time. *Id.* at 956. In finding the plaintiff was not disabled the court stated that "discomfort and disability are not synonyms." *Id.* at 956. If the opposite were true, according to the court, "a very large fraction of the work force would be disabled." *Id.* at 957. In a number of other cases, plaintiffs were found to have comparable or worse eye conditions to that of Habeebuddin, and these limitations were not determined to be a "substantial limitation" for the purposes of the ADA. *See, e.g., Still v. Freeport-McMoran, Inc.*, 120 F.3d 50, 52 (5th Cir. 1997) (plaintiff who had lost the sight in one of his eyes was not "substantially limited" in a major life activity under the ADA, when court determined that plaintiff's other eye functioned normally and allowed him to walk, hear, speak, and breathe); *Weigert v. Georgetown Univ.*, 120 F. Supp. 2d 1 (D.D.C. 2000) (plaintiff suffered from migraine headaches as a result of a neurological disorder that made her highly sensitive to fluorescent lighting or glare from other light sources, but was not "substantially limited" under the ADA because she remained able to maintain

23

a full time job, a family, and graduate level courses); *Monell v. Kansas Association of School Boards*, No. 98-4063-SAC, 2001 WL 487766 (D. Kan. April 18, 2001) (plaintiff who suffered from double vision was not "substantially limited" under the ADA, when she could still drive to work and perform the typical duties of her job); *Lajaunie v. Hibernia Corp.*, Civ.A. 99-0285, 2000 WL 145362 (E.D. La. Feb. 8, 2000) (plaintiff was diagnosed with a disease of the cornea, Fuchs' corneal dystrophy, which made her unable to tolerate glare, but the court determined that she was not "substantially limited" for the purposes of the ADA because she could still read, drive, recreate and work). According to the record, photophobia only limited Plaintiff's ability to work in the vault. It is undisputed that Plaintiff was able to drive while doing field work and that his condition improved when he was outside the vault. In fact, the only evidence that Plaintiff was impaired by photophobia is his own deposition, which alone is insufficient to defeat summary judgment. *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir.1993) ("Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment.")

The court concludes here that there are no disputes of material fact on this issue and that Plaintiff's photophobia is only a minor restriction on his ability to see. On this record, no reasonable jury could conclude that Habeebuddin is disabled under the ADA and Plaintiff's ADA claim cannot survive Defendant's motion for summary judgment.

Even if this court were to find Plaintiff disabled under the ADA, the claim still fails because Plaintiff has not demonstrated that Defendant failed to accommodate his disability. The ADA requires that an employer make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). According to the EEOC interpretive guidelines, "reasonable accommodations" may include: "Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or

24

modifications of examinations, training materials, or policies." 29 C.F.R. § 1630.2(o)(2)(ii).

Without citing a single case that addresses reasonable accommodation, Plaintiff argues that Defendant failed to accommodate his photophobia because it failed to respond to his written request for an accommodation and because Plaintiff's requested accommodation of field work was not accepted. In fact, Plaintiff asserts, Defendant's employees "stood on their heads to do everything but accept this simple request." (Plf.'s Brief, at 11.) Although it is undisputed that Defendant did not provide a written response, accepting or denying Plaintiff's accommodation request, the court notes ample evidence that Defendant did act on Plaintiff's complaints.

Plaintiff began working at the vault in February 1999 and began experiencing eye problems in his first week in that assignment, but did not present a doctor's note regarding the photophobia until April 1999. After receiving this note, Stevens changed Plaintiff's schedule to one week on the street and one week in the vault. (Plf.'s Rule 56.1 ¶ 17.) Later, Anderson directed a change in the lighting in the vault, a change which was ultimately reversed because the new lighting aggravated Plaintiff's eyes even more. (*Id.* ¶ 30.) Subsequently, in April of May 1997, Stevens allowed Plaintiff to perform his vault duties at a nearby desk located outside of the vault. (Def.'s Rule 56.1 ¶ 125.) The new arrangement satisfied Plaintiff, who conceded that the lighting outside the vault was "fine." (*Id.* ¶ 127-29.)

Plaintiff nevertheless claims that Defendant did not reasonably accommodate him because his managers did not remove him from the vault assignment and put him back on field work. It is well established, however, that an employer does not have to provide an employee's preferred accommodation. *Rehling v. City of Chicago*, 207 F.3d 1009, (7th Cir. 2000) ("an employer is obligated to provide a qualified individual with a reasonable accommodation, not the accommodation he would prefer"). Accordingly, this court will not find that Defendant failed to reasonably accommodate Plaintiff's photophobia merely because it selected accommodations different than the one suggested by Plaintiff. Thus, even if the court were to conclude that

Plaintiff's condition constitutes a disability, it would dismiss Plaintiff's ADA claim on the basis that no reasonable jury could find that Defendant failed to accommodate Plaintiff's condition.

**Retaliation Claim**

In his original complaint, Plaintiff alleged that Defendant's employees retaliated against him because he filed an EEOC charge on May 27, 1999. Specifically, Plaintiff alleged that Defendant retaliated against Plaintiff by: (1) failing to promote him; (2) failing to accommodate his disability; (3) harassing him; and (4) underrating his performance during official evaluations. In opposing summary judgment, however, Plaintiff alleges a claim that "does not focus on any particular employment decision" but "is better characterized as a harassment claim." (Plf.'s Brief, at 13.)

In support of this vaguely-articulated harassment claim, Plaintiff cites but a single case: *Faragher v. City of Boca Raton*, 524 U.S. 775, 785-86 (1998). In *Faragher*, the Court examined a sexual harassment claim brought by a female plaintiff alleging that her employer discriminated against her by creating "an abusive work environment." *Id.* at 786. The Court noted that Title VII covers more than just tangible or economic discrimination; an employer also discriminates when harassment creates a hostile work environment. *Id.* at 786.

Title VII provides that it is unlawful for an employer to retaliate against an employee who "has opposed any practice made an unlawful employment practice . . . or [who] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing . . ." *Stutler v. Illinois Dep't of Corrections*, 264 F.3d 698, 702 (7th Cir. 2001) (citing 42 U.S.C. 2000e-3(a). Where, as in this case, there is no direct evidence of retaliation, a plaintiff must proceed under the burden-shifting method of proof, *Smart v. Ball State Univ.*, 89 F.3d 437, 439 (7th Cir. 1996) (citing *McDonnell Douglass Corp. v. Green*, 411 U.S. 792, 802 (1973), under which the plaintiff must first establish a prima facie case, that is, evidence from which the trier of fact can draw an inference of discrimination. *Stutler*, 264 F.3d at 702. If the plaintiff can meet this initial

26

burden, defendant must "articulate a legitimate, nondiscriminatory reason for its employment decision." *Id.* Assuming defendant does so, plaintiff bears the burden of demonstrating that the true reason for the employment action was discriminatory. *Id.*

To establish his prima facie case of retaliation, Plaintiff must offer evidence that: "[he] engaged in statutorily protected activity; (2) [he] performed [his] job according to [his] employer's legitimate expectations; (3) despite meeting [his] employer's legitimate expectations, [he] suffered a materially adverse employment action; and (4) [he] was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Hilt-Dyson v. City Of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). There is no dispute between the parties that Plaintiff engaged in a protected activity when he filed his EEOC charge on May 27, 1999. Defendant argues, however, that Plaintiff can not demonstrate any adverse action or a causal link between the protected action and the alleged adverse action. The court agrees.

Turning first to the link between the protected action and the alleged adverse treatment, the court notes the absence of any evidence regarding this element: Habeebuddin did not identify any similarly situated employee, who did not engage in a protected activity, but was treated more favorably. Equally important, there is insufficient evidence here that Plaintiff suffered adverse action at all. Habeebuddin claims that Defendant created a hostile work environment in response to his EEOC charge. *See Stutler*, 263 F.3d at 703 (retaliatory harassment by supervisors can rise to the level of an adverse employment action). Specifically, Plaintiff identified the following circumstances that he believes establish a hostile environment: (1) Defendant made no formal verbal or written response to his May 24, 1999 accommodation request; (2) in June 1999, Kelso verbally abused Plaintiff and used the work "fuck"; (3) in September 1999, Morgan was promoted to supervisor over Plaintiff; (4) Plaintiff suffered from headaches as a result of working in the vault; (5) Morgan "closely supervise[d]" Plaintiff after he returned to field work in November 1999 and

introduced new operating procedures; (6) on November 26, 1999 and December 6, 1999, Plaintiff submitted letters to his supervisors complaining of mistreatment by Kelso, Stevens and Morgan; (7) in January 2000, Elizondo was promoted to supervisor, a position Plaintiff wanted; and (8) Plaintiff filed his second EEOC charge and was provided disability leave. (Plf.'s brief, at 14-15.)

To constitute a hostile work environment, the defendant's conduct must be "sufficiently severe or pervasive so as to alter the conditions of the victim's employment and to create an abusive working atmosphere." *Ribando v. United Airlines, Inc,* 200 F.3d 507, 511 (7th Cir. 1999) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). The standard in making this determination is both subjective and objective; Plaintiff must show that an objectively reasonable person would find the work environment to be sufficiently hostile or abusive, and that he also subjectively perceived the environment to be hostile or abusive. *Harris,* 510 U.S. at 21-22. Both sides agree that Plaintiff has established the subjective element, but dispute whether a reasonable person would find the environment to be hostile.

The court concludes Defendant must prevail on this issue. In *Stutler,* 263 F.3d 698, the Seventh Circuit examined working conditions more severe than the ones at issue here and determined that plaintiff was not subjected to a hostile work environment. Plaintiff Stutler filed a series of claims against her supervisor, Rockett, for making discriminatory comments about plaintiff's age and race. *Id.* at 700-701. Rockett responded to these claims in a number of inappropriate ways, including: (1) telling plaintiff repeatedly that "she had to go"; (2) sending an e-mail to the agency director describing plaintiff's behavior as "bizarre"; (3) telling plaintiff that she was going to be moved to a less desirable location; and (4) directing plaintiff to return her key to Rockett's office. *Id.* at 704. Although the court stated that it did not approve of Rockett's actions, these actions were not sufficient to rise to the level of an adverse action because they "were too petty and tepid to constitute a material change in the terms and conditions of Stutler's

28

employment." *Id.*

In this court's view, a reasonable person would not find Habeebuddin's work environment more adverse than the one facing the plaintiff in *Stutler*. There, the plaintiff was being threatened, harassed, and undermined by a superior. The same is not true of Habeebuddin. Several of the circumstances of which he complains are not adverse at all. Thus, the fact that Defendant made no formal response to his request for accommodation is insignificant, in light of the evidence that Defendant did in fact take steps to accommodate his vision problem. The fact that Plaintiff suffered headaches might be a function of his photophobia, but can not be characterized as a product of harassment. Nor does the fact that Plaintiff wrote letters of complaint, filed an EEOC charge, or was placed on disability leave at his own request reflect any mistreatment on the part of his managers.

The most significant complaints related to Plaintiff's hostile work environment claim are that Kelso used the word "fuck" while talking to Plaintiff; Morgan too closely supervised Plaintiff and instituted new procedures; and Plaintiff was passed over for a promotion twice after filing his EEOC complaint. Given Plaintiff's undisputed long history of performance problems at work, it is not unreasonable that he was passed over for a promotion or was supervised more closely than others. Plaintiff does not explain how the new procedures affected his work environment, nor does he suggest that they applied only to him. Furthermore, although the court does not endorse the use of the term "fuck" in dealing with employees, the court is unwilling to find that its limited use here creates a hostile work environment.

The court finds that there is no genuine dispute as to whether Plaintiff's work environment was hostile. Defendant's motion for summary judgment on his retaliation claim is granted.

## CONCLUSION

For the reasons explained above, Defendant's motion for summary judgment (Doc. No. 14-1) is granted and Plaintiff's motion to strike (Doc. No. 24-1) is denied. The court concludes that there are no disputes of material fact concerning whether Plaintiff is disabled or whether he was reasonably accommodated by Defendant. Accordingly, the court finds that Defendant is entitled to judgment as a matter of law on Plaintiff's claim of discrimination under the ADA. Nor are there facts sufficient to create a dispute that Plaintiff suffered an adverse employment action as a result of filing his EEOC charge against the Defendant. Finally, as explained earlier, Plaintiff's claim of national origin discrimination is waived. Judgment will therefore be entered in favor of Defendant and against Plaintiff.

ENTER:

Dated: March 31, 2003

REBECCA R. PALLMEYER
United States District Judge